[Cite as *State v. McNew*, 2011-Ohio-6179.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                    :         C.A. CASE NO.    24180

v.                                               :         T.C. NO.    07CR3503

MICHAEL A. MCNEW                                 :        (Criminal appeal from
                                        Common Pleas Court)

    Defendant-Appellant                  :

                                                 :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ____2nd____ day of ____December____, 2011.

· · · · · · · · · ·

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 424 Patterson Road, Dayton, Ohio 45419
        Attorney for Defendant-Appellant

· · · · · · · · · ·

FROELICH, J.

{¶ 1} Michael A. McNew was found guilty by a jury of rape of a child under the age of 13 and gross sexual imposition. He was sentenced to ten years to life for the rape and to five years for the gross sexual imposition, to be served consecutively. He appeals from his convictions.

I

{¶ 2} Several police officers, a nurse, and a DNA analyst testified for the State. The victim, who was McNew's 11-year-old step-daughter, did not testify, but her account of the alleged sexual assault was recounted by the nurse who examined her the same night. The State's evidence established the following facts.

{¶ 3} The victim alleged that, on August 25, 2007, McNew came into her bedroom during the night, removed her underwear, "kissed her boobies and licked *** between [her] butt," and put his finger in her "private part." McNew then fell asleep on the victim's bed, and she left the room and called 911.

{¶ 4} When the police arrived, they found the victim on the porch dressed only in a nightshirt. They talked with the victim on the porch, then waited outside while the victim entered the house to get her mother. The victim's mother was initially uncooperative with the police and angry at the victim.

{¶ 5} While the police were talking with the victim and her mother in front of the house, officers observed McNew through the windows, walking through the house; he was naked except that he was draped in what the officers described as a comforter, cape, or robe. After getting dressed, McNew attempted to leave the house through the back door with his dog on a leash; the police detained him and took him to the Safety Building for questioning. The officers found a comforter on the victim's bed which appeared to match the fabric in which McNew had been wrapped when they first observed him.

{¶ 6} The victim was examined by a nurse at Children's Medical Center. The nurse testified that, in the course of her treatment, the victim recounted the sexual contact with her

step-father, as described above. The examination of the victim revealed no physical evidence of sexual trauma, and no bodily fluid was observed on the victim's body. The nurse also testified that the victim smiled and laughed during their interaction, and that a "wide variety" of reactions and behaviors is typical in children who are examined for signs of sexual abuse.

{¶ 7} When McNew was questioned by the police, he gave inconsistent accounts of his activities earlier in the evening; he also stated that there was "no excuse" for what he had done, but refused to elaborate. Based on the victim's account that she had been digitally penetrated, the police swabbed McNew's hands. DNA tests of the swabs revealed that the victim's DNA was on McNew's fingers, and the DNA analyst testified that the large amount of the victim's DNA found on the swabs was more consistent with contact with a bodily fluid than with casual contact.

{¶ 8} McNew testified in his own defense. He stated that he generally had a good relationship with the victim, but that she suffered from emotional issues. He denied going into her room and having sexual contact with her on the night of the alleged offenses.

{¶ 9} The defense also called the victim's school psychologist, who testified that, during her treatment of the victim's emotional and behavioral problems during the school year that began in August 2007, the victim recanted her allegation of sexual abuse. According to the school psychologist, the victim came to believe that she had had a dream about sexual abuse and was frustrated that no one believed her when she changed her story. The school psychologist also testified, more generally, that the victim had trouble distinguishing between fantasy and reality.

{¶ 10} A family friend who slept at the family's house on the night of the alleged offenses and babysat for the victim earlier in the evening also testified for the defense. The friend testified that, when she was in her room, she heard McNew come home and go to his own room; she did not hear anything else until the police arrived.

{¶ 11} In 2008, McNew was tried for and convicted of rape and gross sexual imposition. At this trial, the trial court refused to allow the school psychologist to testify about the victim's recantation, concluding that no exception to the hearsay rule applied. We reversed McNew's convictions, holding that the victim's statements to the school psychologist constituted an exception to the hearsay rule because they were made during the course of her treatment for emotional and psychological problems. In our Opinion, we also discussed several instances in which hearsay was improperly admitted at trial, particularly in testimony from police officers about what the victim had told them. In most of these instances, the defense had not objected, and we found no plain error. See *State v. McNew*, Montgomery App. No. 22902, 2009-Ohio-5531 ("*McNew I*").

{¶ 12} After we reversed his prior conviction, McNew was again tried by a jury and found guilty of rape and gross sexual imposition. He was sentenced as described above.

{¶ 13} McNew raises five assignment of error on appeal.

II

{¶ 14} McNew's first assignment of error states:

{¶ 15} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 1 SECTION 10 OF THE OHIO

CONSTITUTION."

{¶ 16} McNew claims that he was denied the effective assistance of counsel because his attorney did not ask that his offenses be merged for sentencing and because his attorney did not seek to suppress McNew's statements to the police.

{¶ 17} We review claims of ineffective assistance of counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Strickland,* 466 U.S. at 688. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Id.

## A. Merger

{¶ 18} We begin with McNew's argument that counsel was ineffective in failing to request that the offenses be merged for sentencing, because they were allied offenses of similar import.

{¶ 19} The merger of offenses is governed by R.C. 2941.25, which is a "prophylactic statute that protects a criminal defendant's rights under the Double Jeopardy Clauses of the United States and Ohio Constitutions." *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, ¶45. R.C. 2941.25 provides:

{¶ 20} "(A) Where the same conduct by defendant can be construed to constitute two

or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

**{¶ 21}** "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

**{¶ 22}** The defendant bears the burden to prove entitlement to merger. *State v. Thomas*, Franklin App. No. 10AP-557, 2011-Ohio-1191, ¶16.

**{¶ 23}** Recently, in *Johnson,* the Supreme Court of Ohio announced a new manner of applying R.C. 2941.25 to determine when offenses are allied offenses of similar import that must be merged. It abandoned the previous test, set forth in *State v. Rance*, 85 Ohio St.3d 632, 1999-Ohio-291, which called for a comparison of the statutory elements solely in the abstract. *Johnson* held that, when determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered. Id. at ¶44. The Supreme Court explained:

**{¶ 24}** "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. *State v. Blankenship* (1988), 38 Ohio St.3d 116, 119. (Whiteside, J., concurring) ('It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both

offenses.' [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

{¶ 25} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, at ¶50 (Lanzinger, J., dissenting).

{¶ 26} "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

{¶ 27} "Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R .C. 2941.25(B), the offenses will not merge." *Johnson* at ¶48-51.

{¶ 28} *Johnson* emphasized the "absurd results" that flowed from the prior standard of analyzing the definitions of offenses in the abstract to determine whether they were allied offenses. The Court found that, in its application, the prior standard had been "so subjective and divorced from the language of R.C. 2941.25 that it provide[d] virtually no guidance to trial courts and require[d] constant ad hoc review." Id. at ¶40. "***[T]he purpose of R.C. 2941.25 is to prevent shotgun convictions, that is, multiple findings of guilt and corresponding punishments heaped on a defendant for closely related offenses arising from the same occurrence. This is a broad purpose and ought not to be watered down with artificial and academic equivocation regarding the similarities of the crimes. When 'in

substance and effect but one offense had been committed,' the defendant may be convicted on only one offense." Id. at ¶43 (internal citations omitted).

**{¶ 29}** The offense of rape, as charged in McNew's indictment, is defined at R.C. 2907.02(A)(1)(B). It states: "No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender when *** [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Sexual conduct "means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. ***" R.C. 2907.01(A).

**{¶ 30}** Gross sexual imposition, as charged in this case, is defined at R.C. 2907.05(A)(4), which states: "No person shall have sexual contact with another, not the spouse of the offender *** when *** [t]he other person *** is less than thirteen years of age, whether or not the offender knows the age of that person." Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

**{¶ 31}** The legislature clearly intended that certain types of touching for the purpose of sexual arousal or gratification be treated as a distinct offense from rape. We recognize, however, that such touching often accompanies a rape. Both offenses can be committed by the same or similar conduct, but whether, in a particular case, "in substance and effect but

one offense has been committed" may be a very fact-sensitive determination. *Johnson* at ¶43.

**{¶ 32}** In this case, McNew was convicted of gross sexual imposition based on conduct which involved kissing the victim's breasts and/or licking her buttocks. He was convicted of rape based upon digital penetration of the victim's vagina. McNew does not argue that these offenses were committed by the same conduct; he argues only that "there is nothing in the record that would justify a *** finding that there were intervening acts sufficient to conclude that there was a separate animus for the rape and gross sexual imposition." McNew skips the first part of the analysis in *Johnson*: whether it is possible to commit one offense and commit the other with the same conduct. Although in some cases, including this one, the analysis of the conduct and the analysis of the animus will be very similar, we begin our discussion with McNew's conduct.

**{¶ 33}** In McNew's case, the nurse who examined the victim testified about the basic nature of the victim's allegations about her contact with McNew. Because the victim did not testify, and because of limitations on the admissibility of hearsay, few details of the encounter were presented. For example, it is unclear whether some of the acts occurred simultaneously, whether any conversations or other actions occurred between the various types of sexual contact and conduct, and over what length of time the events occurred.

**{¶ 34}** Even assuming, for the sake of argument, that McNew's conduct in kissing and licking the victim could be considered part of the course of conduct that culminated in the rape, it did not facilitate the rape and appears to have occurred separately. The conduct involved different parts of the victim's body, and it would not have been possible for McNew

to commit all of the alleged contacts simultaneously. Therefore, based on the evidence presented, we cannot conclude that the same conduct and same mens rea constituted the commission of both the gross sexual imposition and rape. Because McNew had the burden of proving that the offenses should be merged, and the evidence presented does not lead us to conclude that "in substance and effect but one offense had been committed," we cannot conclude that McNew was entitled to have the offenses merged.

{¶ 35} We could end our analysis of the allied offenses issues here, because the evidence does not support the conclusion that the same conduct resulted in McNew's conviction for gross sexual imposition and rape. However, we will also address McNew's reliance on

{¶ 36} *State v. Dudley*, Montgomery App. No. 22931, 2010-Ohio-3240, in support of his argument that counsel was ineffective in failing to seek merger of the offenses.

{¶ 37} In *Dudley*, which was decided before *Johnson*, the defendant was alleged to have fondled the victim's nipple under her dress while he was vaginally raping her with his penis; these actions resulted in charges for gross sexual imposition and rape, respectively. Under the analysis set forth in *Rance*, we concluded that the "elements of these statutory offenses *** correspond[ed] to such a degree that commission of one crime will result in the commission of the other." *Dudley* at ¶52, citing *State v. Roy* (June 21, 1991), Montgomery App. No. 12525. We further concluded that "no separate animus existed in [*Dudley*], because Dudley's actions [the fondling of the victim's nipples] occurred during the rape." Id. at ¶54.

{¶ 38} A few months after *Dudley* was decided, but also prior to *Johnson*, we decided

another case involving merger of gross sexual imposition and rape. In *State v. Young*, Montgomery App. No. 23438, 2010-Ohio-5157, the defendant vaginally raped the victim with his penis and touched her breasts and buttocks during the rape. He was charged with two counts of gross sexual imposition and two counts of rape and was found guilty of all the charged offenses. The trial court merged the rape offenses, but it did not merge the counts of gross sexual imposition with each other or with the rape.

{¶ 39} Affirming the trial court's decision in *Young*, we stated: "it is undisputed that the vaginal rape and the GSI's involving the victim's breasts and buttocks occurred during a single assaultive episode. That fact standing alone, however, does not require us to hold that the vaginal rape and two GSI's were allied offenses of similar import. The two offenses were committed separately. Given the facts and circumstances in the present case, the separate acts of groping [the victim's] breasts and buttocks were not incidental to the vaginal rape. Simply put, [the defendant] did not necessarily have to touch [the victim's] breasts or buttocks as a result of committing the vaginal rape. Thus, the trial court did not err when it found that the two GSI counts were not allied offenses of the rape count." Id. at ¶110. See, also, *State v. Knight*, Cuyahoga App. No. 89534, 2008-Ohio-579 (cited in *Young* at ¶109).

{¶ 40} Since the court in *Johnson* has rejected the abstract comparison of the offenses used in *Dudley* and *Young,* the value of the earlier cases is limited. Moreover, *Johnson* emphasized that the conduct of the accused "must be considered." Id. at ¶44. In *Dudley* and *Young*, the fondling of the victim's breasts (and, in *Young*, her buttocks as well) was alleged to have happened *during* the vaginal rape. On the record before us, it is not clear that the kissing or the licking of the victim's breasts and buttocks occurred

simultaneously with the vaginal penetration. As a general matter, kissing or licking an erogenous zone is less likely to be incidental to rape than touching, which might serve the dual purpose of restraining the victim. Because these determinations are fact-sensitive, the holding in *Dudley* that there was no separate animus for the gross sexual imposition does not compel us to reach the same conclusion with the facts before us.

{¶ 41} The decisions in *Dudley* and *Young* were based, in significant part, on the court's disparate conclusions with respect to whether there was a separate animus for the fondling that accompanied the rapes. Although the conclusions in those cases are arguably inconsistent, they were very fact-sensitive determinations and do not compel the same conclusion in other cases simply because the same named offenses are charged. This is particularly true in light of *Johnson*, in which the Supreme Court recognized and accepted that its new analytical framework for identifying allied offenses may produce varying results in different cases involving the same set of offenses. *Johnson* at ¶ 52.

{¶ 42} Because the record does not demonstrate that the offenses were allied offenses of similar import and should have been merged, we cannot conclude that McNew's sentence was affected by counsel's failure to raise this issue. Accordingly, we do not conclude that counsel acted ineffectively in failing to raise this issue in the trial court.

B. Motion to Suppress

{¶ 43} McNew also contends that counsel was ineffective in not asking the court to hold a hearing to determine whether his statements to the police should have been suppressed. His statements to the police contained some inconsistencies about his activities the night of the alleged offenses and a statement that there was "no excuse for what [he] did,"

on which he refused to elaborate.

**{¶ 44}** In September 2007, before McNew's first trial, McNew's attorney filed a multi-branch motion to suppress evidence, including the "observations" of the police officers that served to justify his arrest, any items seized at his residence, and any statements made as a result of his "illegal arrest." The memorandum in support claimed that McNew "was not given *Miranda* warnings" prior to being questioned, but was otherwise very general in its assertions. Defense counsel withdrew this motion, without explanation, one month later, and the issue was not raised again before the first or second trial. (McNew was represented by the same attorney at both trials.)

**{¶ 45}** There is no evidence in the record that McNew was questioned without being informed of his *Miranda* rights. Detectives Swisher and Olinger testified that they advised McNew of his rights before they questioned him, and McNew did not contradict these claims.

**{¶ 46}** McNew's argument on appeal relies on his claim at trial that he asked for an attorney during his questioning by the police, but was not provided one. McNew asserts that counsel was ineffective in failing to pursue a motion to suppress on the basis that he was denied his right to counsel.

**{¶ 47}** McNew's alleged request for an attorney was not mentioned in the motion to suppress filed before the first trial, and there is no evidence in the record that his attorney knew of this allegation before McNew testified at the second trial.[1] In fact, McNew points out in his brief that his attorney was "surprised" when McNew testified at the second trial that he had asked for an attorney during the interview.

---

[1]McNew did not testify at the first trial.

{¶ 48} Based on the record before us, we cannot conclude that counsel was ineffective in failing to pursue a motion to suppress on the basis that McNew had asked for an attorney during his interrogation. The record does not establish that McNew ever made such an assertion to his attorney before the second trial.

{¶ 49} At oral argument, McNew's attorney asked us to infer – from McNew's trial testimony and counsel's "surprise" in response – that counsel had never talked with McNew about whether any of McNew's rights had been violated during his interrogation by the police. Indeed, this is one inference that could be drawn from this testimony. But one could also infer that McNew's assertion was a self-serving attempt to cast doubt on the detectives' motives and manner of conducting their investigation. Because counsel is entitled to a strong presumption that his conduct was reasonable, we will not infer that counsel failed to inquire about possible bases to suppress McNew's statements, without any direct evidence to support such a conclusion.

{¶ 50} Moreover, the fact that McNew's statements to the police were contradictory and/or incriminating did not, in itself, require his attorney to file a motion to suppress, as his brief seems to suggest. Unless there was a reasonable basis to believe that such a motion would be successful, counsel was not ineffective in failing to file such a motion.

{¶ 51} The first assignment of error is overruled.

III

{¶ 52} McNew's second assignment of error states:

{¶ 53} "APPELLANT'S RIGHT TO CONFRONTATION UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER THE OHIO

CONSTITUTION WAS VIOLATED BY THE ADMISSION OF HEARSAY TESTIMONY."

**{¶ 54}** McNew contends that, in several instances, he was deprived of his right to confront the witnesses against him by the court's allowance of hearsay testimony. He claims that these errors related to the reasons for our reversal of his prior conviction and were "even more egregious than the first time." He provides "examples" of hearsay testimony, but asserts that the list of examples is "not exhaustive."

**{¶ 55}** Evid.R. 801(C) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement," as included in the definition of hearsay, is an oral or written assertion or nonverbal conduct of a person if that conduct is intended by the person as an assertion. Evid.R. 801(A). "An assertion, for hearsay purposes, is a statement about an event that happened or a condition that existed." *In re K.B.,* Franklin App. No. 06AP-04, 2006-Ohio-5205, ¶23, citing *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, ¶61.

**{¶ 56}** First, McNew contends that Detective Swisher "testified to the jury that he had information that Mr. McNew was wrapped in a comforter from [A.C.]'s bedroom" the night he was arrested. McNew claims that this testimony was improper hearsay because the victim was not present for cross-examination, although the victim was not the source of the "information" in question.

**{¶ 57}** Before Swisher testified, two police officers who responded to the house on August 25, 2007, testified about what they had observed at the house that night. Officers Knedler and Hammann testified that when they were standing outside, lights were on inside

the house and they observed McNew come down the stairs from the second floor two times. Officer Knedler testified that, the first time McNew came down the stairs, he was wearing a "light-colored, what looked like a robe or a cape." Officer Hammann testified that, the first time McNew came down, he was wearing "just a bed sheet, comforter, that type of thing, wrapped around him *** the comforter appeared to be purple, white, pink." Both men testified that McNew later came downstairs dressed in street clothes.

{¶ 58} Officer Hammann further testified that, when the officers later entered the house to collect evidence, he saw the comforter in the victim's room that he had seen McNew wearing, and it was collected as evidence.

{¶ 59} McNew's hearsay argument relates to an exchange at trial in which Detective Swisher was being questioned on direct examination about his interview with McNew at the Safety Building the night of McNew's arrest:

{¶ 60} SWISHER "I asked him if he would go over with me that night what he had done, what had occurred. He stated that night he had went out with some friends, with his wife ***, and that they had consumed – he probably consumed three or four beers.

{¶ 61} ***

{¶ 62} "He stated after the evening out with his wife, that he came home and then he went to sleep with [his wife] in her bed. He stated he took all his clothes off and got in her bed naked to sleep. He stated he was woke up by a knock on the door. He stated he got up, put a pair of Dockers pants on and an orange golf shirt and got the dog and took the dog out the backdoor to use the bathroom.

{¶ 63} "***

**{¶ 64}** STATE: "Did he indicate anything to you about this blanket he was seen wearing?

**{¶ 65}** SWISHER: "I asked him about. [sic] I told him I had information that he was wrapped in a comforter from [the victim's] bedroom. He stated he had no knowledge of that and that at no time did he touch her in any manner or have the blanket on.

**{¶ 66}** STATE: "Did he indicate to you whether or not he went into her room that night.

**{¶ 67}** SWISHER: "He told me that he never went in the room."

**{¶ 68}** In our view, Swisher's testimony was not offered to establish whether McNew was draped in the victim's comforter when officers saw him through the windows. Swisher recounted McNew's statements to the police to highlight some inconsistences between McNew's own statements and the accounts of the officers who responded to the scene, and perhaps to explain why they collected the comforter as evidence. Moreover, this testimony was offered only after Officers Knedler and Hammann had already testified to the same facts based on their own observations. For these reasons, Swisher's testimony was not hearsay and did not deprive McNew of his right to confront the witnesses against him.

**{¶ 69}** Second, McNew contends that Officer Knedler "testified as to things that were told to him after conversations had occurred with the child that led him to take the child to [the hospital]." He claims that Knedler's testimony, "through double hearsay from the child to [Detective] Olinger and from Olinger to Knedler," violated his right to confront the witnesses against him.

**{¶ 70}** In *McNew I*, Knedler testified that, when he was dispatched to the victim's

house, he was told "that there was an 11-year-old female *** who was saying that she was molested by her step-father." We concluded that this testimony was offered for the truth of the matter asserted and was impermissible hearsay, but that it was cumulative of the victim's 911 call, which had been properly admitted. Moreover, defense counsel had not objected to Knedler's testimony, so we reviewed the alleged error only for plain error, i.e., error that clearly affected the outcome of the case. We concluded that Knedler's statement about the reason for his dispatch did not rise to the level of plain error under the circumstances presented.

{¶ 71} In this appeal, McNew objects to different testimony from Knedler. Knedler testified that he was instructed by Detective Olinger to transport the victim to Children's Medical Center to be examined by a doctor and that, when they arrived at the hospital, he informed the staff "why we were there." No details about the nature of the offense, as related by the dispatcher, or about his conversations with hospital staff (if any) were recounted at trial. Although Knedler's testimony did suggest that the victim had made some allegation of abuse, it did not suggest the nature of her statement and was not analogous to Knedler's objectionable testimony at the first trial. Because Knedler's testimony did not suggest the content of the victim's statements to police officers, it was not hearsay under Evid.R. 801.

{¶ 72} Third, McNew contends that the "most glaring" violation of his right to confront his accusers came during the testimony of Detective Swisher about why he swabbed McNew's hand and what part of the hand he swabbed:

{¶ 73} STATE: [Referring to Exhibit 13-B] "*** [W]hen it says saliva standard on

there, do you mean that you collected saliva again on that swab?

**{¶ 74}** SWISHER:    "No.

**{¶ 75}** STATE:      "Okay. What does it mean?

**{¶ 76}** SWISHER:  "It means that I took that cotton tipped swab and swabbed his hand, his right hand.

**{¶ 77}** STATE:  "Okay. Now let's talk about that for just a moment.   You indicated that you swabbed his hand.   Now - - and you wrote on there is [sic] hand, do you mean his hand or what did you swab?

**{¶ 78}** SWISHER:  "No.  I swabbed his index finger and his middle finger on this right hand.

**{¶ 79}** STATE:      "Okay. And why did you do that?"

**{¶ 80}** [OBJECTION AND SIDEBAR]

**{¶ 81}** STATE:      "Detective, you actually conferred with Detective Olinger, correct?

**{¶ 82}** SWISHER      "That is correct.

**{¶ 83}** STATE:  "Okay.   And after conferring with him and interviewing the Defendant in the case, it was – the decision was made to swab his fingers.

**{¶ 84}** SWISHER      "That is correct.

**{¶ 85}** ***

**{¶ 86}** STATE:      "And why did you decide to swab his fingers?

**{¶ 87}** SWISHER:  "Because of the disclosure that the victim had made to Detective Olinger.

{¶ 88} STATE:        "Okay.   About digital penetration?

{¶ 89} SWISHER:     "Yes."

{¶ 90} At the sidebar, the State defended the appropriateness of its question, saying "a detective has to explain the context for why he did a certain thing."   The State also pointed out that there had been "multiple pieces of evidence admitted *** that [McNew] put his fingers inside of [the victim]."   In response, defense counsel pointed out that "he [Swisher] never talked to the nurse and there's no evidence or representations of digital representation on the 9-1-1 tape," suggesting that the information upon which Swisher relied had to have come from the victim.   The trial court overruled McNew's objection to this testimony because "it [did] not come from testimonial," as long as Swisher did not "go into anything specific."

{¶ 91} We agree with McNew that Swisher's testimony that the victim had told Detective Olinger about the alleged digital penetration was hearsay and that it did not fall within any exception to the hearsay rule.   The trial court should not have allowed this testimony.   In our view, however, this statement from Swisher was harmless beyond a reasonable doubt because the same information – the victim's allegation of digital penetration – was before the jury through the properly admitted testimony of the nurse.   Thus, the error does not require reversal of McNew's conviction.

{¶ 92} Having considered and rejected all of McNew's arguments that he was denied a fair trial due to the admission of improper hearsay, his second assignment of error is overruled.

IV

{¶ 93} McNew's third assignment of error states:

{¶ 94} "THE STATE OF OHIO FAILED TO PROVE THAT THE VICTIM WAS LESS THAN THIRTEEN YEARS OLD."

{¶ 95} McNew argues that the State failed to prove that the victim in this case was under thirteen years of age because neither the victim nor her parent or guardian testified.

{¶ 96} There is no requirement that the age of a victim be established through her own testimony or that of a parent or guardian. In this case, the State relied on the nurse's testimony that, in obtaining a medical history from the victim, the victim reported that her date of birth was September 27, 1995. The State also presented the victim's State of Ohio Office of Vital Statistics birth certificate, bearing the appropriate seal, which listed her date of birth as September 27, 1995 (Ex. 14). McNew did not object to the nurse's testimony about the victim's age. With respect to the birth certificate, defense counsel noted the "[s]ame objection as last trial, ***. I don't think it's self-authenticating, but I have a feeling I know what you will rule." The court admitted the exhibit.

{¶ 97} Although McNew asserts in his brief that the State's evidence of the victim's age "was either hearsay or lacking in authentication or proper foundation," he made no specific argument in support of this position. Evid.R. 902(1) states that: "Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following: (1) A document bearing a seal purporting to be that of the United States, or of any State, *** and a signature purporting to be an attestation or execution." The birth certificate submitted as Exhibit 14 bears the seal of the State of Ohio and the signature of the Local Registrar of Vital Statistics. The document satisfied the requirements for self-authentication

set forth in Evid.R. 902(1).   Further, the nurse's testimony about the victim's age, which was presumably based on the victim's own statements, was not hearsay because the victim's statement was made in the course of her treatment, and the defense did not object to the nurse's testimony.

{¶ 98} The third assignment of error is overruled.

V

{¶ 99} McNew's fourth assignment of error states:

{¶ 100} "THE VERDICT OF THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 101} McNew claims that his conviction was against the manifest weight of the evidence because the State's case relied "predominantly [on] hearsay testimony."

{¶ 102} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson,* Montgomery App. No. 22581, 2009-Ohio-525, ¶12.   When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175; *State v. Elmore,* 111 Ohio St.3d 515, 2006-Ohio-6207, ¶44.

{¶ 103} Because the trier of fact sees and hears the witnesses at trial, we must defer to

the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288. However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id.

{¶ 104} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin,* 20 Ohio App.3d at 175.

{¶ 105} In support of its case, the State presented the victim's 911 call, in which she reported that her stepfather had "molested" her in her room and urged that the dispatcher send help quickly. It also offered the testimony of the officers who responded to the victim's house. These officers testified that they first saw McNew inside the house, naked and wrapped in a comforter or robe. McNew did not come to the front window or door, although one of the officers signaled for him to do so. McNew then got dressed and left the house through the back door with his dog; the police stopped him outside the house. The police officers on the scene did not observe any indicia that McNew was intoxicated at that time.

{¶ 106} After the victim and McNew were taken from the house, the police obtained a limited consent to search the house from Mrs. McNew; she allowed the officers to view the stairs, upstairs hallway, and the victim's bedroom; she would not allow them into the master bedroom. The comforter in which the officers had seen McNew wrapped when he first came down the stairs and a pair of the victim's underwear were found on the victim's bed.

{¶ 107} The police took McNew to the Safety Building for questioning and swabbed

his hands for DNA. During questioning by Detective Olinger,[2] McNew first reported that he had been out with his wife, eating and drinking with some friends, then had come home and gone to bed. McNew stated that he was in bed with his wife until the babysitter (who was also sleeping at the house) woke him and stated that the police were at the house. McNew denied any sexual contact with the victim. McNew also denied being intoxicated, and Detective Olinger did not believe, based on his observations of McNew, that McNew was intoxicated.

{¶ 108} When Detective Olinger "talked about DNA" with McNew, McNew "changed his statement." McNew stated that, when he and his wife had returned home, they got into an argument. In his anger, McNew left the house again and went to two strip clubs. McNew stated that he did not remember anything that happened between the time he left the last strip club and when the babysitter woke him up in his own bed. Olinger questioned McNew about why he had lied when he gave his first account of the evening; McNew "said there's no excuse for what I did," but refused to elaborate.

{¶ 109} The State also presented the testimony of the nurse who completed the victim's rape kit at Children's Medical Center. According to the nurse, the victim reported that she had been asleep in her room when her stepfather entered, removed her underwear, kissed her breasts, licked "between [her] butt," and placed his fingers into her "private part." The nurse's exam of the victim was "normal," but she explained that, due to the "stretchy" nature of the "vaginal area," "objects can be inserted without there being any obvious tearing, scarring or trauma."

---

[2]Detective Olinger died sometime after McNew's first and before his second trial. His testimony

{¶ 110} When the swabs taken from McNew's fingers were tested, the victim's DNA was found in a quantity that suggested to the DNA analyst that there had been contact with a bodily fluid, rather than casual contact. Although the DNA analyst was cross-examined about the similarities between the DNA of the victim and her mother, she testified definitively that the DNA on McNew's fingers belonged to the victim.

{¶ 111} The defense relied heavily on the testimony of the victim's school psychologist, who stated that, during her treatment after the alleged rape, the victim recanted her story, claiming that it had been a dream. The psychologist also testified that the victim suffered from mental and emotional problems and had problems with her perception of reality (e.g., belief in unicorns and aliens).

{¶ 112} At trial, McNew repeated the second version of events he had recounted to Detective Olinger, i.e, that he and his wife had argued around the time that they had returned home from a night out, that he had left the house again to visit some strip clubs, and that he did not remember anything that happened between talking to a bartender at the second strip club he visited and being woken up in his own bed by the babysitter. McNew also testified about the victim's emotional problems and denied the victim's allegations.

{¶ 113} The defense also emphasized the lack of physical findings of sexual trauma, the absence of bodily fluids on the victim's body, and the victim's smiles and laughter during her examination at the hospital. (The nurse had testified about this behavior, but she also testified that a "wide variety" of reactions and behaviors by children to such a situation were typical.)

at the first trial was played via video for the jury at the second trial.

{¶ 114} Based on the evidence presented at trial, the jury could have reasonably concluded that McNew was guilty beyond a reasonable doubt of rape and gross sexual imposition. The jury did not clearly lose its way and create a manifest miscarriage of justice, and we will not reverse its finding of guilt.

{¶ 115} The fourth assignment of error is overruled.

VI

{¶ 116} McNew's fifth assignment of error states:

{¶ 117} "THE CUMULATIVE EFFECT OF ERRORS COMMITTED AT THE TRIAL COURT LEVEL WARRANTS REVERSAL."

{¶ 118} McNew contends that, based on the arguments raised in his other assignments of error, he is entitled to a reversal of his conviction on the basis of cumulative error, even if this court concludes that the errors, individually, do not warrant a reversal.

{¶ 119} The Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus *may* warrant the reversal of his conviction. (Emphasis added.) *State v. DeMarco* (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. Although McNew's trial was not without error, upon a complete review of the record, we cannot conclude that prejudicial error occurred in this case. Moreover, the doctrine of cumulative error does not apply because McNew has not identified multiple instances of harmless error. *State v. Garner* (1995), 74 Ohio St.3d 49, 64.

{¶ 120} The fifth assignment of error is overruled.

VII

{¶ 121} The judgment of the trial court will be affirmed.

. . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

R. Lynn Nothstine
Jay A. Adams
Hon. Barbara P. Gorman